IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 NOV -4  PM 3: 08

DEPUTY CLERK

| | | |
|---|---|---|
| JERRY A. STAGGS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 4:15-CV-0701-BL |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of Social Security, | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U. S. C. § 405(g), Plaintiff seeks judicial review of a decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. *See* Compl. (doc. 1). The Commissioner has filed an answer, *see* Def.'s Answer (doc. 9), and a certified copy of the transcript of the administrative proceedings, *see* SSA Admin. R. [hereinafter "Tr."] (docs. 12-13), including the hearing before the Administrative Law Judge ("ALJ"). The parties have briefed the issues. *See* Pl.'s Br. (doc. 18); Def.'s Resp. Br. (doc. 19). Based upon the parties' Consent to Proceed Before a United States Magistrate Judge (doc. 11), the United States District Judge reassigned the case to the undersigned pursuant to 28 U.S.C. § 636(c). *See* Order (doc. 14). After considering the pleadings, briefs, administrative record, and applicable law, the Court reverses the Commissioner's decision and remands this case for further administrative proceedings consistent with this order.

## I. BACKGROUND

Plaintiff claims that he is disabled due to a right foot/heel injury, post-traumatic stress disorder ("PTSD"), hearing and heart problems, tinnitus (ringing in the ears), and a back injury. Tr. 155, 165, 182. In a brief submitted at the administrative level, Plaintiff's attorney identified cervical

degenerative disc disease and emphysema as other severe impairments. Tr. 238. Plaintiff filed an application for DIB on November 20, 2012, alleging disability beginning October 28, 2009. Tr. 141. His date of last insured ("DLI") is December 31, 2009. Tr. 27. The ALJ thus defined "the adjudicative period" as being between October 28 and December 31, 2009. *See id.* Typically that is also the relevant period for purposes of judicial review, but for reasons stated more fully later, the relevant period in this case extends beyond the adjudicative period.

The Commissioner denied the application initially and on reconsideration. Tr. 77-90. On May 5, 2014, Administrative Law Judge ("ALJ") Darren Hamner held a hearing on Plaintiff's claim. *See* Tr. 39-76. On July 25, 2014, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled and was capable of performing his past relevant work. Tr. 25-34. Applying the sequential, five-step analysis set out in 20 C.F.R. § 404.1520(a)(4), the ALJ first determined that Plaintiff had not engaged in substantial gainful activity during the adjudicative period. Tr. 27. The ALJ next determined that, during the adjudicative period, Plaintiff suffered from one severe impairment – a heel bone fracture in his right foot. Tr. 28. Third, the ALJ found that, during that same period, Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any impairment in the listings.[1] *Id.* The ALJ then determined that, during the adjudicative period, Plaintiff retained the residual functional capacity ("RFC")[2] to perform medium work[3]

---

[1] The relevant regulations explain the purpose and use of the listings of impairments. *See* 20 C.F.R. § 404.1525.

[2] A claimant's RFC "is the most [he or she] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). When a case proceeds before an ALJ, it is the ALJ's sole responsibility to assess the claimant's RFC. *Id.* § 404.1546(c). But that assessment must be "based on all of the relevant medical and other evidence" of record. *Id.* § 404.1545(a)(3).

[3] As defined by the applicable regulation: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

with no more than six hours standing or six hours sitting in an eight-hour workday, but Plaintiff would also require the ability to alternate between "sitting or standing every hour for a few minutes at a time." *Id.*

Based upon the RFC determination and testimony from a vocational expert ("VE") about the exertional demands and skill requirements of Plaintiff's prior jobs, the ALJ concluded that, during the adjudicative period, Plaintiff could perform his past relevant work as a helicopter mechanic (Dictionary of Occupational Titles ("DOT") # 621.281-014) and truck driver (DOT # 904.383-010) as those jobs are ordinarily performed in the national economy. Tr. 33-34. At Step 4 of the evaluative sequence, the ALJ thus found that Plaintiff was not disabled within the meaning of the Social Security Act during the adjudicative period. Tr. 34.

The Appeals Council ("AC") received and considered additional evidence – answers to interrogatories to Kweli Amusa, M.D., (Exhibit 13F) – when it denied review on January 30, 2015. Tr. 6-9. It found that the submitted information provided no basis for changing the decision of the ALJ. Tr. 7-9. The ALJ's decision is the Commissioner's final decision and is properly before the Court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (stating that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

Plaintiff commenced this social security appeal on September 21, 2015. *See* Compl. He presents a single issue for review: (1) whether the Appeals Council erred in its analysis of the new and material evidence submitted to it. *See* Pl.'s Br. at 1, 4-7. The Commissioner argues that properly framed the issue is whether substantial evidence supports the decision of the ALJ based on the administrative record as a whole, including the evidence submitted to the Appeals Council. Def.'s

Resp. at 1, 7-10.

## II. LEGAL STANDARD

In general,[4] a person is disabled within the meaning of the Social Security Act, when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). "'Substantial gainful activity' is work activity involving significant physical or mental abilities for pay or profit." *Masterson v. Barnhart*, 309 F.3d 267, 271 n.2 (5th Cir. 2002) (citing 20 C.F.R. § 404.1572(a)-(b)). To evaluate a disability claim, the Commissioner employs the previously mentioned

> five-step sequential analysis to determine whether (1) the claimant is presently work-ing; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity.

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007). If, at any step, the Commissioner determines that the claimant is or is "not disabled, the inquiry is terminated." *Id.* at 448. The Commissioner must assess the claimant's RFC before proceeding to Steps 4 and 5. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). For Steps 1 through 4, the claimant has the burden to show disability, but the Commissioner has the burden at Step 5 to "show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. If the Commissioner carries that Step 5 burden, "the burden shifts back to the claimant to rebut th[e] finding" that he or

---

[4]The Act provides an alternate definition of disability for blind individuals who are fifty-five years of age or older. *See* 42 U.S.C. § 423(d)(1)(B). This provision is inapplicable on the current facts.

she can perform other work that is available in the national economy. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

"Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied." *Sun v. Colvin*, 793 F.3d 502, 508 (5th Cir. 2015) (quoting *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion' and constitutes 'more than a mere scintilla' but 'less than a preponderance' of evidence." *Hardman v. Colvin*, No. 15-30449, 2016 WL 1551685, at *3 (5th Cir. Apr. 11, 2016) (quoting *Newton*, 209 F.3d at 452). "In applying the substantial evidence standard, the court scrutinizes the record to determine whether such evidence is present, but may not reweigh the evidence or substitute its judgment for the Commissioner's." *Perez*, 415 F.3d at 461.

Nevertheless, "the substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the [Commissioner's] decision." *Singletary v. Bowen*, 798 F.2d 818, 822-23 (5th Cir. 1986). The courts instead "must consider the record as a whole, and the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.* (citations and internal quotation marks and alterations omitted); *accord Pena v. Colvin*, No. 5:14-CV-016-C, 2015 WL 738255, at *4 (N.D. Tex. Feb. 20, 2015) (adopting recommendation of Mag. J.); *Lara v. Colvin*, No. 5:13-CV-177-C, 2014 WL 988547, at *3 (N.D. Tex. Mar. 13, 2014) (same). However, the courts neither "try the questions *de novo*" nor substitute their "judgment for the Commissioner's, even if [they] believe the evidence weighs against the Commissioner's decision." *Masterson*, 309 F.3d at 272. The Commissioner resolves conflicts of evidence. *Sun*, 793 F.3d at 508.

## III. ANALYSIS

Plaintiff frames the issue in this appeal as an error of the Appeals Council in analyzing the new evidence submitted after the ALJ's decision. Pl.'s Br. at 4-7. Relying on *Higginbotham v. Barnhart*, 405 F.3d 332 (5th Cir. 2005), he argues that the final decision of the Commissioner includes review of the decision of the AC to deny review. *Id.* at 4. He further argues that, when there is good cause for the failure to incorporate new and material evidence into the record in a prior proceeding, the district court may remand for consideration of the new evidence. *Id.*

The good cause requirement arises, however, when a claimant seeks a remand based on new evidence that was not presented in the challenged administrative proceeding. *See* 42 U.S.C. § 405(g) (providing that the district courts "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding"); *Leggett v. Chater*, 67 F.3d 558, 567 (5th Cir. 1995) (applying good cause requirement when evidence was considered in a subsequent disability proceeding but not the initial proceeding then under review); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994) (applying good cause requirement when evidence was initially submitted to district court). The present circumstances do not require consideration of good cause. Here, the AC accepted the newly submitted evidence and made it a part of the administrative record of this case. Good cause is not at issue when the AC denies a request for review. That context requires the AC to "consider and evaluate any 'new and material evidence' that is submitted, if it relates to the period on or before the ALJ's decision." *Sun v. Colvin*, 793 F.3d 502, 511 (5th Cir. 2015) (quoting 20 C.F.R. § 404.970(b)). The AC grants or denies a request for review in accordance with regulations that "do not require the AC to provide

a discussion of the newly submitted evidence or give reasons for denying review." *Id.*

Under *Higginbotham*, the final decision of the Commissioner includes the denial of a request for review and any new evidence submitted to the AC. 405 F.3d at 334, 337. However, it is not the purpose of judicial review to decide whether the AC erred in denying a request for review. A denial of a claimant's request for review "becomes part of the Commissioner's final decision," but it is the ALJ's decision that remains binding on the claimant. *Sun*, 793 F.3d at 511. Consequently, in the current context, "this court must examine all of the evidence, including the new evidence submitted to the AC, and determine whether the Commissioner's final decision to deny [the claimant's] claim was supported by substantial evidence." *Id.* at 510.

Despite an administrative record that exceeds 1300 pages, the parties' briefing provides minimal assistance as to the issue of substantial evidence. Plaintiff speaks generally about the disability decision not being supported by such evidence, but he frames the issue as an error of the Appeals Council in analyzing the new evidence from Dr. Amusa. Even considering the new submission, he makes only a passing argument as to substantial evidence. He argues that the new evidence could cause the ALJ to find him capable of light work with some restrictions instead of medium work as found by the ALJ. In effect, he argues that the new evidence fairly detracts from the weight of other evidence of record.

Although the Commissioner identifies the issue as one of substantial evidence and argues that the newly submitted evidence does not overcome the substantial evidence that already supports the decision, she makes minimal effort to support that argument. Citing to the ALJ's decision (Tr. 30) and a record (Tr. 563) of a state agency reviewing physician, John Durfor, M.D., "who found Staggs's alleged limitations unsupported by the record," the Commissioner contends that substantial

evidence supports the decision to find Plaintiff able to perform medium work. *See* Def.'s Resp. at 8. The ALJ does refer to Exhibit 4F, which is the one-page record that the Commissioner cites to in her brief. *See* Tr. 30. However, that August 18, 2010 record is a "Case Assessment Form" which does not state that Plaintiff's alleged limitations are unsupported. Dr. Durfor instead stated that the "alleged limitations are not fully supported" by the file. Tr. 563. In addition, after reviewing all medical evidence available at that time, Dr. Durfor found "insufficient evidence due to DLI in the past." *Id.* The one-page assessment, moreover, is devoid of detail. It sets out no facts to support the decision of the ALJ and appears wholly conclusory with respect to whether the record supports Plaintiff's alleged limitations.

Standing alone, the case assessment of Dr. Durfor does not constitute substantial evidence regarding Plaintiff's ability to perform medium work. *Cf. Brown v. Astrue*, No. 3:08-CV-0255-D, 2009 WL 64117, at *4 (N.D. Tex. Jan. 12, 2009) (recognizing that "an ALJ may properly rely on an RFC assessment prepared by a state agency medical consultant, provided it is a function-by-function assessment" and the "assessment constitutes substantial evidence, at least where it is not wholly conclusory"). The Commissioner submits that "other substantial evidence" supports the decision. Def.'s Resp. at 9. She points to medical records that describe the heel fracture as well-healed four and eight months after surgery. *Id.* (citing Tr. 274 (June 2010 record), 336 (March 2010 record)). While that evidence may provide some support for finding that Plaintiff was able to return to the work that he performed prior to the injury, it falls short of the global assessment of the administrative record needed to determine whether substantial evidence supports the decision of the ALJ.

Based on the arguments of the parties and the administrative record there is no dispute that Plaintiff was able to perform medium work prior to fracturing his heel in October 2009. In fact,

during opening statements at the hearing before the ALJ, Plaintiff's representative agreed that the claimant's prior relevant work was medium, skilled jobs. Tr. 42. The VE similarly identified the helicopter mechanic position as medium, skilled and the truck driver position as medium, semi-skilled. Tr. 68. Plaintiff also testified that he would still be able to perform helicopter repair work had he not hurt his heel and that he unsuccessfully tried to do that work in 2010. Tr. 62. From the arguments of the parties, the only alleged impairment at issue in this appeal is Plaintiff's foot injury. His other alleged impairments, including mental impairments, did not preclude his employment prior to the heel injury.

In addition to the sparse briefing of the parties, several matters complicate this case. First, as a self-employed helicopter mechanic when he fractured his heel, Plaintiff had no need to obtain any sort of medical authorization to be off of or to return to work. The self-employment, further-more, resulted in a sporadic earnings record that shows no earnings since 2006. *See* Tr. 148-150. In addition, because Plaintiff injured his foot just two months before the passing of his date last insured, much of the relevant medical record relates to the time period post-insured status. That brief period also resulted in the ALJ unduly emphasizing the two-month "adjudicative period," instead of determining whether Plaintiff had a severe impairment that lasted or was expected to last at least twelve months. Finally, the contemporaneous medical record with respect to the foot fracture is primarily surgical records and follow-ups without any particular reason to document Plaintiff's ability to return to work and physicians of the Social Security Administration primarily state that there is insufficient supporting evidence or find that Plaintiff had no severe impairment. The post-insured medical record also addresses complications and other medical issues that arose after Plain-tiff's insured status expired. It is in this context that the Court must determine whether substantial

evidence supports the ALJ's decision and a summary of the relevant medical record will aid in that determination.

On October 23, 2009, Plaintiff reported to an emergency room with complaints of pain in his right foot following a fall.[5]  Tr. 871.  He "landed on the heel of his right foot" and had been unable to place weight on it.  *Id.*  X-rays showed "a severely comminuted fracture of the calcaneus" and a second "fracture vertically of the anterior margin of the calcaneus."  Tr. 873.  He was given a hard boot and crutches.  *Id.*

The medical record shows a severe heel fracture that required surgery on November 18, 2009, to insert a metal plate and screws ("hardware").  Tr. 283, 297-99, 344, 348-49, 365-66, 868-69.  Per Plaintiff's testimony, surgeons inserted thirteen screws and seven plates and it felt like he was walking on a "junk yard" until the hardware was removed in April 2011.  Tr. 43, 65.  Following the initial surgery, he was placed on "strict nonweightbearing on the right lower extremity for 12 weeks with crutches."  Tr. 366.

As of December 8, 2009, the fracture was "internally fixed" and the "fracture fragments [we]re in near anatomical alignment."  Tr. 282.  On December 29, 2009, a radiologist found "no significant interval change."  Tr. 281.  As of the end of December, Plaintiff was "doing extremely well" and the incision was well-healed.  Tr. 347.  Plaintiff was advised to continue non-weight bearing for another six weeks.  *See id.*  The hardware remained intact without abnormality.  *Id.*

The foregoing medical record appears completely at odds with the finding of the ALJ that Plaintiff retained the RFC to perform medium work with a sit/stand option during the adjudicative period as defined by the ALJ as October 28, 2009, through December 31, 2009.  After Plaintiff

---

[5]Plaintiff testified that he fell about ten feet from the top of a helicopter.  Tr. 43.

fractured his heel in October 2009, he could not have performed medium work at any time prior to the end of that year. There is no medical or other evidence to support finding that he could perform work as a helicopter mechanic or truck driver during that two month period.

Under the circumstances of this case, however, that two-month period does not represent the entire relevant time period. For Plaintiff to be entitled to disability benefits, his foot impairment had to preclude any substantial gainful activity for at least twelve continuous months. *See* 42 U.S.C. § 423(d)(1)(A). Although Plaintiff testified that he attempted to repair a helicopter in 2010 and has continued to sell helicopter parts on occasion, Tr. 46-47, 62, the administrative record contains no support for finding that Plaintiff engaged in substantial gainful activity after he fractured his heel. This is consistent with the ALJ's finding that Plaintiff did not engage in substantial gainful activity during the two-month adjudicative period. *See* Tr. 27. While the ALJ could have precisely addressed whether Plaintiff engaged in any substantial gainful activity during the twelve-month period following his foot injury, it is clear from his decision that he found that Plaintiff had not done so.

Because there is no issue that Plaintiff has not engaged in substantial gainful activity since his heel fracture, the pertinent question is whether he had an impairment or combination of impairments that precluded all substantial gainful activity for at least twelve months. By denying disability benefits, the ALJ necessarily found that Plaintiff's foot injury did not preclude all substantial gainful activity for the required duration. The post-insured medical record is relevant to determine whether substantial evidence supports that finding.

As of February 4, 2010, Plaintiff had "been non-weight bearing" and had "some tightness in the back of the cast." Tr. 344, 867. A radiologist found stable hardware, but noted decreased bone density, i.e., osteopenia, involving the right foot. Tr. 280. The primary diagnosis was "abnormal."

11

Tr. 281. It was recommended that he "begin weight bearing." Tr. 344, 868. He was placed in a "boot" and was permitted to begin "weight bearing as tolerated." Tr. 345. He received a walker with a front wheel. *Id.* The physical therapist set a goal for Plaintiff to ambulate 100 feet with walker. Tr. 346. About a week later at his initial evaluation on a physical therapy consult, Plaintiff complained of "difficulty walking due to pain and swelling on the right ankle." Tr. 340-41. He reported a pain level of ten on a one-to-ten scale. Tr. 341. X-rays revealed stable hardware that remained in position. *Id.* His condition was diagnosed as abnormal. Tr. 342.

In early March 2010, Plaintiff reported that he was doing okay, but his ankle was sore after physical therapy. Tr. 340. On March 11, 2010, Plaintiff reported that "he rode a bike yesterday up hill and made his foot pretty sore." Tr. 337. Plaintiff was hospitalized on March 18, 2010, for deep vein thrombosis ("DVT") "secondary to immobilization from his fracture repair." Tr. 315. At that time, he had "Abnormal - right leg edema from foot to thigh." Tr. 332. The DVT was "complicating" recovery from his foot surgery. Tr. 333. The fracture was "well healed" and "in adequate position," with no evidence of hardware failure. Tr. 336, 867. Plaintiff was advised that, when there is no DVT, "swelling is normal consequence of [his] high energy [fracture] and may persist indefinitely, albeit less than now." *Id.* A radiology report of March 18, 2010, notes "[i]ncreasing osteopenia" of bones in the foot. Tr. 277. An ultrasound of that same date confirmed the presence of DVT and a "major abnormality." Tr. 278. The next day, he "was instructed that he's on strict bedrest." Tr. 324. When discharged on March 20, 2010, he was referred for anticoagulation consult, which resulted in prescribed medication for DVT. Tr. 314-15. On discharge, he was also "reminded not to bear weight on his right leg." Tr. 322. He was discharged via wheel chair. Tr. 317.

A medical record dated June 10, 2010, notes that Plaintiff's post-operation course has been

"complicated by DVT," but the incision and fracture were well-healed, with fracture "in adequate position" and "no evidence of [hardware] failure." Tr. 301-02. At that time, Plaintiff was ambulating with a cane. Tr. 301. It was suggested that he discontinue "cane when comfortable to do so." Tr. 302. The next day, a radiologist noted that "[t]he fracture appears healed," but also noted "[g]eneralized osteopenia of bones in the foot" and recorded the diagnosis as "abnormal." Tr. 274. After noting a "[m]oderate degenerative change" in the foot and "questionable fusion of the intertarsal joint," the radiologist characterized the condition as abnormal and "attention needed." Tr. 276.

In July 2010, Plaintiff reported "[d]oing well except for right foot pain and dental pain." Tr. 399. He rated the pain level from his leg as a nine. Tr. 401. The medical record also indicates that he was restoring a helicopter with "plans to fly it next March." Tr. 399. Plaintiff was in no apparent distress and ambulated with a cane. Tr. 400. The physician ordered an ultrasound to see whether the thrombus had resolved. *Id.* A July 22, 2010 scan indicates that the blood clot had improved and some blood flow had resumed through the blockage. Tr. 544. The diagnosis remained "abnormal." Tr. 545.

The preceding medical summary provides the relevant medical record that Dr. Durfor reviewed on August 18, 2010, when he concluded that Plaintiff's alleged limitations were not fully supported and that insufficient evidence existed to determine disability due to the December 31, 2009 date of last insured. *See* Tr. 563. He did not review any subsequent medical records.

A review of the entire medical record through the date of Dr. Durfor's case assessment reveals no substantial evidence to support a finding that Plaintiff had the physical ability to return to his relevant work. A reasonable mind could not accept that evidence to support such finding. The single-page assessment from Dr. Durfor certainly does not provide the necessary substantial evidence

and the two notations about the fracture being well-healed do not adequately take into consideration the resulting limitations that may flow from the fracture even if well-healed. Those notations appear to be no more than isolated bits of information cherry-picked to support the ALJ's position. Even though the incision and fracture may have been well-healed early in the recovery period, Plaintiff remained unable to resume weight-bearing activity for twelve weeks per the doctor's orders. About the time Plaintiff would resume weight-bearing activity he began to have complications from DVT. Although the DVT showed improvement in July 2010, Plaintiff's condition remained abnormal.[6]

Because the Court must examine the administrative record as a whole when determining whether substantial evidence supports the ALJ's decision, it also reviews the medical record created subsequent to the review by Dr. Durfor. A medical record dated August 26, 2010, states that Plaintiff had blood clots in his left ankle and calf in March 2010 and was "off feet for 6 months" following his foot surgery. Tr. 847. At that time, Plaintiff remained on medication for his blood clots. *Id.* With ten being excruciating pain, that same record shows a pain rating of six when sitting; eight when walking; and the pain is primarily from his heel, but some from knees. Tr. 848.

A December 16, 2010 record regarding Plaintiff's foot surgery recognizes DVT as a "postoperative complication" and states: "The patient now continues to have pain with walking for extended periods of time. He ambulates with a cane. He is unable to do some types of work that he previously was doing. He cannot get on top of helicopters and walk on uneven surfaces." Tr. 832. Physical examination showed (1) increased swelling of the right lower extremity when compared to the left;

---

[6]Because the DVT complication arose after Plaintiff's DLI, it might be argued that it should be considered separately from the fractured heel. However, the DVT arose directly from the surgery to repair the heel. Consequently, it also could be argued that the two are too intertwined to separate them. In any event, the Court makes no determination as to whether the DVT is a new impairment that came into existence after Plaintiff's DLI. Moreover, to the extent that the DVT is a new impairment, it is not possible to separate its presence from the heel fracture – at least without the opinion of a medical expert.

14

(2) intact sensations; (3) a "well-healed scar"; (4) mild tenderness over incision; and (5) some pain with flexion. *Id.* X-rays showed hardware in "good position, and the fracture appears to be healed," but also showed some fusion and mild arthritis. Tr. 832, 903. The stated impression was: "Stable without significant interval change from 6/10/2010." Tr. 903. The assigned diagnosis code was "abnormal." Tr. 904. Medical personnel recognized that the hardware was "potentially causing pain at the calcaneus fracture" and began discussing "hardware removal." Tr. 832. A December 28, 2010 ultrasound revealed that Plaintiff's DVT had returned to an occlusive thrombus. Tr. 903.

On January 5, 2011, Nancy Childs, M.D., completed a one-page "Case Assessment Form." *See* Tr. 592. Citing the medical record of December 29, 2009, she noted that as of that date, six-weeks post-operation, Plaintiff was "doing extremely well"; the "incision [wa]s well-healed"; and Plaintiff was able to wiggle toes and had good sensation throughout lower extremities. *Id.* Like Dr. Durfor, she concluded that there was insufficient evidence of disability prior to date late insured. *See id.*

On April 11, 2011, surgeons removed Plaintiff's hardware – a metal plate and thirteen screws. Tr. 892-93, 904. Plaintiff returned on April 28, 2011, for follow-up and a scan showed no movement in the fracture following the removal of the hardware, but bones were "somewhat demineralized, osteoporosis." Tr. 902. Plaintiff did not return for another follow-up until July 7, 2011. Tr. 765. At that time, he had "no complaints"; was "ambulating on his right heel"; and stated that he was "much better" since the hardware removal. *Id.* Although he was "still having a little pain down in his heel," it was "much improved" following that removal and was "getting better as the months go by." *Id.* Clinically, he appeared "to be doing very well." *Id.* As of July 13, 2011, his DVT had improved significantly with a "moderate residual thrombus" in one vein and a "min-

imal residual thrombus" in another vein, which was "significantly recanalized compared with complete occlusion on previous study." Tr. 901. Eight days later, x-rays showed a healed fracture with osteoporotic "skeletal structures." Tr. 900-01. Plaintiff's pain was "much improved." Tr. 761. On July 21, 2011, Plaintiff was discharged from the clinic with respect to his foot injury. *Id.*

When the SSA initially denied Plaintiff's application for benefits on February 7, 2013, it found a primary diagnosis of "Anxiety related disorders." Tr. 77. It also found the "medical evidence in file" insufficient to establish a secondary diagnosis. *Id.* The record later reiterates that the medical record was insufficient prior to DLI. Tr. 80. The SSA found no severe impairment. Tr. 81. The physician completed a Psychiatric Review Technique Form ("PRTF") for the anxiety related disorders but nothing regarding any physical impairment or RFC assessment. Tr. 81-82. When the SSA denied the claim on reconsideration in May 2013, it added no new opinion, diagnosis, or result. *See* Tr. 84-91.

At the hearing before the ALJ in May 2014, Plaintiff provided testimony as to his limitations, work history, and daily activities. *See* Tr. 41-68. According to Plaintiff, since his injury, he cannot load heavy parts and can only walk about 200 feet before needing to get off his foot. Tr. 44-48. He estimated that he could only lift and carry ten to fifteen pounds. Tr. 57. He also testified that he had to stop his truck driving job because of a neck injury that hindered his ability to look left and right while driving. Tr. 45. Although he still drove two or three times a week at most at the time of the hearing, his foot limited him to about once a week until 2011, and regardless, he only drives about an hour. Tr. 55, 63-64. He also testified that, even after the hardware removal, he could not stand on a helicopter or work off a ladder. Tr. 44.

With respect to Plaintiff's foot impairment, the ALJ noted that Plaintiff was "doing extremely

well" in December 2009 with "good sensation throughout the lower extremity, and imaging studies showed intact hardware without abnormality." Tr. 29. He also recognized that Plaintiff had been "advised to continue non-weight bearing for six more weeks." *Id.* The ALJ further noted (1) the March 2010 record showing a well-healed right heel fracture and advice that swelling was a normal part of the injury; (2) the June 2010 record showing no hardware failure and encouragement to discontinue use of a cane; (3) the July 2010 record showing DVT improvement and a report that Plaintiff was restoring a helicopter at that time; (4) the August 2010 assessment of Dr. Durfor; (5) Plaintiff's report in December 2010 that "he was unable to walk on uneven surfaces or for extended periods of time"; (6) April 2011 records showing removal of the hardware; (7) Plaintiff's testimony "that his condition substantially improved following the surgery"; (8) Plaintiff's noncompliance with the post-surgery treatment plan following that removal; and (9) the February 2013 SSA determination that there was insufficient evidence to find a severe physical impairment and the May 2013 affirmance of that determination. Tr. 29-30. The ALJ also considered Plaintiff's other testimony at the hearing and his daily activities, including mowing the lawn, feeding chickens, driving a motor vehicle, shopping for groceries, using a computer, watching movies, playing with dogs, barbecuing, assisting with a veteran's museum, and driving to Mexico once. Tr. at 31.

With the extent of Plaintiff's daily activities and the evidence that his foot impairment responded well to treatment, the ALJ found only limited support for Plaintiff's statements of specific exertional and nonexertional limitations. *Id.* Given the successful surgery for his fractured heel and subsequent conservative treatment during the adjudicative period, the ALJ found that Plaintiff's description of the severity of his symptoms not supported by objective findings and his credibility was "called into doubt by the evidence of malingering and noncompliance with his treatment plan."

Tr. 32. Even though state agency consultants found no severe physical impairment, the ALJ gave

Plaintiff "the benefit of the doubt . . . by assessing his residual functional capacity at the medium

level in consideration of pain and his subjective complaints." *Id.* After securing testimony from a

VE, the ALJ found that Plaintiff retained the RFC to perform his prior relevant work. Tr. at 33.

Following the adverse decision of the ALJ, Plaintiff sent medical expert interrogatories to

Dr. Amusa, an independent physician in Slidell, Louisiana. *See* Tr. 1311-14. As a non-examining

consultant, Dr. Amusa reviewed the administrative record, including the medical record (Exs. 1F to

12F). Tr. at 1311. On December 4, 2014, Dr. Amusa found that Plaintiff had sustained a severe

right foot fracture in October 2009; which required surgery on November 18, 2009; and was com-

plicated by DVT in March 2010. Tr. 1311-14. He found no evidence to support "any joint deformity

or instability resulting in the inability to ambulate effectively," but he also found that "a prescribed

hand-held assistive device is necessary for ambulation." Tr. 1312. He opined that, in a full-time job

setting, Plaintiff could (1) sit for six hours; (2) stand/walk for three to four hours; (3) lift or carry

twenty pounds occasionally and ten pounds frequently; (4) frequently stoop, reach, and handle

objects; and (5) occasionally climb, balance, kneel, crouch, and crawl. Tr. 1312-13. Plaintiff would

also be limited to only frequent use of right lower extremity to operate foot controls. Tr. 1313. Dr.

Amusa found that these functional limitations "have been present since at least October 28, 2009,"

and has persisted through the date of his opinion. *Id.*

Substantial evidence is not an onerous standard. The role of the Court, furthermore, is not

to reweigh the evidence. Nevertheless, the substantialness of the evidence must take into considera-

tion evidence that fairly detracts from its weight. Much of the evidence relied upon by the ALJ has

other evidence that detracts from it. That Plaintiff was doing extremely well in December 2009 must

take into account the undisputed circumstances then existing – namely, being six weeks post oper-

ation and still in a non-weight bearing restriction. Tr. 347. Similarly, that the fracture was well-

healed four and eight months post-operation, provides only part of the picture when the medical

record shows pain and complications impacting the claimant's ability to engage in substantial gainful

activity. Furthermore, the encouragement to discontinue use of a cane came with a material qual-

ification – "when comfortable to do so." Tr. 302. While Plaintiff may have been restoring a heli-

copter in July 2010, the record does not exhibit an ability to engage in that activity on a full-time,

sustained basis. *See* Tr. 399. In its social history section, the record merely states: "Last employed

1981 by car dealership. Has done some work since then as helicopter mechanic, which is what he

did while in military. Restoring Bell UH-1 helicopter, plans to fly it next March." *Id.* Finally,

Plaintiff's testimony regarding his improved condition following his surgery relates to the surgery

to remove the hardware. *See* Tr. 43-44.

The ALJ questions Plaintiff's credibility due to malingering and noncompliance with treat-

ment plan, but the record discussing malingering relates to Plaintiff's mental impairments and simply

states that "malingering cannot be ruled out in this case" due to results of one test. *See* Tr. 395.

Moreover, the noncompliance with the treatment plan relates to the time period immediately after

the hardware removal. *See* Tr. 765 (page 149 of Ex. 9F cited by ALJ). Until that point, the record

appears to reflect a patient following prescribed treatment with respect to his heel injury.

The ALJ also relied on Plaintiff's daily activities to undercut his exertional and nonex-

tertional limitations. While Plaintiff indeed testified as to his daily activities, the ALJ ignores

Plaintiff's accommodations to perform many of the activities. He feeds the chickens by using a six-

wheel vehicle called a "Gator" to drive to them to let them out. Tr. 49. He obtained the Gator after

breaking his heel. *Id.* at 49-50. He uses a riding lawnmower when he mows his yard, which is about 200 feet by 200 feet. Tr. 50. He testified that he "very seldom go[es] grocery shopping" because he does not like being around people and that when he goes, he uses a cart rather than walking. Tr. 51. He testified that he may go shopping "[m]aybe twice a month." Tr. 64. While he does barbeque, he stated that he has done hardly any since hurting his foot. Tr. 53. With respect to the trip to Mexico, Plaintiff testified that the trip was in 2012 to obtain medicine for his wife and that he drove for "about an hour." Tr. 55. As for driving, Plaintiff testified that he uses "cruise control" and places his injured right foot across his left leg when he drives one hour to Dallas. Tr. at 60-61, 64. He further testified that he drove "maybe once a week" in 2010 and that increased to two to three times weekly in 2011. Tr. 63-64. He drives for "maybe an hour and that's it." Tr. 64.

From the record as a whole, it appears that Plaintiff did not resume weight-bearing on his right foot until June or July 2010 at the earliest, but he continued to have heel pain. Ultimately, he underwent surgery to remove the hardware in April 2011. At that point, it appears that he obtained significant relief from the pain. It was also at that point that he became non-compliant with his treatment plan. The medical records of July 2011 paint a much different picture of Plaintiff's foot impairment than the records prior to hardware removal. However, by that time, Plaintiff had not engaged in substantial gainful activity for more than twelve months since his foot injury. To the extent that the ALJ concluded that Plaintiff regained the ability to perform medium work within twelve months of the foot injury, the Court finds no substantial evidence to support that conclusion and the opinions of Dr. Amusa provide specific medical opinions that Plaintiff was limited to light work for that entire period and beyond.

Reviewing physicians of the SSA essentially found insufficient evidence with respect to

Plaintiff's physical impairments during the insured period. Had the ALJ likewise found insufficient evidence, he may have utilized one or more of the actions set out in 20 C.F.R. § 404.1520b(c): (1) recontacting a treating source, (2) requesting additional records, (3) obtaining a consultative examination, or (4) seeking information from others. The ALJ instead inferred from the one-page case assessment of Dr. Durfor, isolated excerpts from the medical record, and partial testimony of the claimant that he had the RFC for medium work with a sit/stand option. That inference appears speculative given the evidence before the ALJ. Although an ALJ "is permitted to draw reasonable inferences from the evidence in making [an RFC] decision . . . social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence." *Stoll v. Colvin*, No. 3:14-CV-1239-N, 2015 WL 233312, at *5 (N.D. Tex. Jan. 16, 2015) (accepting recommendation of Mag. J.). The opinions of Dr. Amusa provide additional support for finding the inferences of the ALJ unreasonable. On the current record, the Court finds no substantial evidence to support a finding that Plaintiff had the RFC to perform medium work with a sit/stand option within twelve months of October 28, 2009.

Plaintiff urges the Court to find him disabled based upon the opinions of Dr. Amusa because the Medical-Vocational Guidelines direct a finding of disability. Pl.'s Br. at 6. The Commissioner disagrees with Plaintiff's assessment. Def.'s Resp. at 9-10. At this point, that determination should be initially made by the ALJ on remand. Although the opinions of Dr. Amusa are part of the administrative record, they were not before the ALJ. It is uncertain how the ALJ will weigh them. If the ALJ finds the evidence insufficient to determine whether Plaintiff is disabled, he may pursue avenues for additional information provided by 20 C.F.R. § 404.1520b(c).

In general, when the Court finds the ALJ decision not supported by substantial evidence, the

21

proper remedy is to remand for further proceedings pursuant to sentence four of 42 U.S.C. § 403(g). This case presents no reason to depart from the general rule.

On remand, the ALJ should remain cognizant of the complicating matters of this case. In particular, while the adjudicative period – as defined by the ALJ – provides an important time period for resolution of Plaintiff's disability claim, the full twelve-month period following an alleged disabling injury is relevant and may extend even further so long as the medical records are relevant to Plaintiff being disabled within his insured status. It is critical for the ALJ to determine the period of time that Plaintiff's foot fracture precluded any substantial gainful activity. If Plaintiff was able to return to substantial gainful activity within twelve months of the injury then the injury is not disabling within the meaning of the Social Security Act. On the other hand, if Plaintiff's impair- ments precluded all substantial gainful activity for at least twelve months then he would be entitled to a finding of disability. Of course, if his impairment later medically improved to such an extent to no longer be disabling, the ALJ could find Plaintiff only entitled to a closed period disability. *See Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002) (discussing closed periods of disability).

## IV.  CONCLUSION

For the foregoing reasons, the Court finds no  substantial evidence to support the decision to deny benefits and thus reverses the decision of the Commissioner and remands this case for further administrative proceedings consistent with this order.

**SO ORDERED this _4th_ day of November, 2016.**

**E. SCOTT FROST**
**UNITED STATES MAGISTRATE JUDGE**

22